VT SUPERIOR COURT

STATE OF VERMONT

SUPERIOR COURT    *(handwritten)*    CIVIL DIVISION
Washington Unit    *(stamp)*    Docket No. 378-6-16 Wncv

DALE PHILLIPS
    Plaintiff

    v.

RICHARD LINTON BROCK and
SARAH DAWSON BROCK
    Defendants

## DECISION

This issue in this case is whether Plaintiff Dale Phillips holds an easement for the benefit of her residential property over immediately adjacent lands of Defendants Richard Linton Brock and Sarah Dawson Brock. In two prior decisions, this court has ruled on summary judgment that (1) the easement was created for the benefit of Plaintiff's land in 1976 and remains in her chain of title as a matter of deed construction (Partial Decision, November 3, 2017), and (2) that Plaintiff is not precluded from claiming the easement on grounds of estoppel (Decision, December 26, 2017). In this final phase of the litigation, an evidentiary hearing was held on Defendants' defenses of abandonment and acquiescence, and their counterclaim for adverse possession.

A hearing was held on August 26 and 27, 2019. The court had previously taken a site visit. Plaintiff is represented by Attorney Mark G. Hall, and Defendants are represented by Attorney Geoffrey Fitzgerald.

### Findings of Fact

The chain of events that led to this lawsuit began in 1976 when Plaintiff's father and stepmother, the Ferrises, purchased a 10-acre property from Heney. The conveyance to them included an easement on the land retained by Heney. The easement location was a 60-foot wide strip that ran the length of the western boundary of the purchased lot on adjacent remaining Heney land, and Heney retained the right to convey access easements to others over it. At that time, all the Heney land was part of a former farm and was open undeveloped land. Heney had obtained a permit in 1975 for a road of limited length (not as long as the easement), but as of the time of the conveyance, no subdivision survey was in place.

Heney built the permitted road in 1976, conveyed it to the Town, and sold the remaining 4 lots in the 5-lot subdivision. The lot sold to the Ferrises was designated as Lot 1. Access to Lots 1, 3, 4, and 5 was on the Town road. Lot 2 was the furthest away from the Town road. Access to it was along the Town Road to the cul-de-sac where the

1

Town road ended, and then from the cul-de-sac on, over a private easement on a portion of the same easement described above.

Thus, once the subdivision was finished, there was a Town road that ended in a cul-de-sac roughly half way along the original easement. It served all five lots, but Lot 2 did not have frontage on it, and extending beyond the Town road were two private easements that were undeveloped and unused:

(a) Lot 1 held an easement across Lots 5 and 2 that continued along its full western boundary (hereinafter "Lot 1 easement"—the easement at issue in this case), and

(b) Lot 2 held an easement in the same location but shorter as it only crossed Lot 5 to provide access to Lot 2 (hereinafter "Lot 2 easement").

The sequence of conveyances and location of the easements are shown on Exhibits 1–7 attached to the Decision of November 3, 2017.

The marriage of Plaintiff's father, Cyrus Ferris, Jr., and stepmother, Marguerite Ferris, was the third for both, and each had children, mostly grown. In 1978, they created the Ferris Family Trust, and conveyed their interests in the property to the Trust. There were four Trustees in all, two from each side of the marriage: Cyrus Ferris, Jr. (hereinafter CYFJr.); his adult son Tikhon Ferris; Marguerite Ferris; and her adult son Nicholas Ward. Thereafter CYFJr. was the Trustee in charge of what occurred on the property. While he kept the other Trustees informed (often after the fact), he made all the decisions and took care of all issues.

The Trust owned the newly built house for CYFJr. and Marguerite on Lot 1, with a driveway that came off the Town road roughly halfway along the Town road (thus approximately one quarter of the way along the easement described in the original deed). With the driveway in this location, the Ferrises did not rely on the continuing remainder of the Town road for access. The remaining length of the Lot 1 easement, beyond the cul-de-sac along the 60-foot strip, was not developed and was not used.

The land surrounding the Ferris residence was high and open and Marguerite loved the land and surrounding views. Lot 2, which was below Lot 1 and visible from it, included an open field. It was purchased in 1977 by Bush, but as of 1979 no house was constructed on it and Marguerite did not want to see a house built there. CYFJr., in his individual capacity, and not on behalf of the Trust, purchased Lot 2 from Bush in 1979. Thus he acquired, together with Lot 2, the Lot 2 easement for access to Lot 2 across Lot 5. He did not develop Lot 2. Marguerite enjoyed having it open and undeveloped.

In 1979, the Fosses bought Lot 5 and built a house. Their lot was below and adjacent to Lot 1 and was subject to the Lot 1 and Lot 2 easements, which, although they existed in documents in the land records, were not laid out or developed in any way on the ground. The Fosses built their house quite close to the westerly edge of the 60-foot wide undeveloped Lot 1 and Lot 2 overlapping easements.

2

CYFJr. was an engineer and a meticulous man and careful recordkeeper. He kept a close eye on all his interests and transactions. From the time he acquired Lot 2 in 1979, he maintained active use of the Lot 2 easement across the Fosses' Lot 5 to get to Lot 2, even though there were no structures on Lot 2. He intentionally walked or drove a truck over the Lot 2 easement location, although the land was undeveloped and there was no visible road, thus crossing the Fosses' Lot 5 (on the course of the overlapping Lot 1 and Lot 2 easements) to gain access to Lot 2.

He did this at least twice a year in order to maintain the easement interest, accompanied by his stepson and fellow Trustee Nicholas Ward. When he made these trips, he only went as far as the near part of Lot 2. He did not continue the full length of the Lot 1 easement all the way alongside the western boundary of Lot 1 Trust land. The topography of the easement strip beyond where it passes entry onto Lot 2 is that it goes down into a gully and then curves uphill to the left and then enters the corner of an open mowed field. Over the years a stand of pine trees grew where the boundary line and easement route curved uphill. These trees were not particularly large in 1996 as shown on the 1996 ortho aerial photo (Exhibit 24-A), and they would have been much smaller from 1979 to 1990. It is likely that it would have been possible to drive through them then, but CYFJr. did not do so.

During the course of their ownership of Lot 5 (1979–1988), the Fosses planted a sugar maple tree in front of their house within the 60-foot wide easement location approximately halfway between the sides of the easement, i.e., right in the middle of it. When planted, it was not large. They also planted a Norway maple within the easement strip.

CYFJr. and James Brock had been fellow sailors and friends for 20 years, and with their wives, the couples had been good friends. James Brock was CYFJr.'s lawyer. In 1988, James and Gladys Brock bought Lot 5 from the Fosses and moved into the house. Both CYFJr. and the Brocks knew of the Lot 2 easement that crossed in front of the Brock house and close to it to provide access to Lot 2. The Brocks did not want a house on Lot 2 with a driveway close to the front of their house. James Brock planted a non-native spruce tree in the middle of the easement area. At that time, the easement area on Lot 5, in front of the Brock house, encompassed both the overlapping Lot 1 and Lot 2 easements, but the Brocks' concern was that a house would be built on Lot 2 such that a driveway would run close to the Brock house leading to a house on Lot 2. CYFJr. was upset that Mr. Brock had done this apparently deliberate act of planting a tree squarely within CYFJr.'s easement that provided access to his Lot 2.

CYFJr. located a buyer for Lot 2, Bernard, at a good price (without telling his wife), and then sent a memo in April of 1989 of "Suggested Solutions to Right of Way Problem" to the Brocks in which he identified the most obvious solution to the right of way issue: he offered to sell Lot 2 to the Brocks for the same price Bernard was offering. The Brocks requested that the Lot 2 easement be moved further to the east (onto Trust land) so that it would be further from their house. CYFJr. declined. The Brocks bought Lot 2 in 1990, thereby foreclosing any possibility of someone building on Lot 2 and

3

building a driveway through what was essentially their front yard. They felt they had been forced into incurring the expense of buying Lot 2. From that point on, the friendship between CYFJr. and James Brock was over. The men had provoked each other, and they never spoke again. The friendship between the couples was also over.

The court has previously ruled, and now confirms based on the evidence admitted at the evidentiary hearing, that the Suggested Solutions memo and the negotiations surrounding extinguishment of the Lot 2 easement related only to the Lot 2 easement.[1] The only owner of Lot 2 was CYFJr. in his individual capacity, and the memo is written from him in his individual capacity and clearly references only himself as owner of Lot 2. There is no reference to extinguishing the Lot 1 easement. The court finds it highly likely that CYFJr. thought that the sale was going to extinguish *all* easement rights (see below), but the legal transaction that was contemplated and occurred was a conveyance only by CYFJr. as owner of Lot 2 and no legal documents operated to relinquish the Lot 1 easement on behalf of the Trust.

Nonetheless, the evidence is consistent from many witnesses and much evidence relating to a long period of time that in 1990, no one realized that the Trust continued to hold the Lot 1 easement over Lots 5 and 2 for the benefit of Lot 1. The evidence is clear that after the developed road up to the cul-de-sac became a Town road in 1976, CYFJr. did not realize that the Trust property continued to hold an easement for Lot 1 over the undeveloped portion of the easement beyond the end of the Town road. This is understandable as it is apparent that the original purpose of the easement was to provide access for all lots in the subdivision over a common road. Once the permitted and developed portion became a Town road in 1976 and the Trust subsequently ran its driveway off it at a point midway along the Town road, the remainder of the Lot 1 easement was not needed for any lot (except for the short portion leading to Lot 2) and no longer had importance.

Lots in the subdivision were subject to a permit that required a minimum lot size of 10 acres, and Lot 1 was 10.5 acres, so it could not be subdivided and thus no additional access was needed since the driveway to the Lot 1 residence was already built. Lot 2, which was the only lot not on the Town road, had an individually defined easement access. The remainder of the Lot 1 easement simply became a matter of no significance, and was apparently forgotten, if it was ever appreciated as existing in the first place by any affected owner, which may or may not be the case. Alternatively, there may have been some assumption on the part of CYFJr. that once the Town road was built and owned by the Town, there was no further easement in existence.

In any event, the evidence is clear that CYFJr. did not realize that the Trust of which he was the principal active Trustee held the Lot 1 easement at issue in this case. The evidence is also clear that James Brock, who was a lawyer, did not know of the existence of the Lot 1 easement at the time of the purchase of Lot 2. The reason that the 'solution to the right of way problem' related only to the Lot 2 easement was that no one knew that the Lot 1 easement existed.

---

[1] See Decision of December 26, 2017.

The evidence clearly establishes that no one on either the Trust side or the Brock side was aware of the existence of the remaining Lot 1 easement over Lots 5 and 2 from 1979 until 2016 when surveyor Stephen Fraser did a new survey for Plaintiff. This is shown by the following evidence:

- CYFJr. actively used the Lot 2 easement throughout his ownership of Lot 2 (1979–1990). He drove it at least twice a year with his son-in-law and fellow Trustee Nicholas Ward. He only used it to go as far as Lot 2 (not all the way to the end of the Lot 1 easement) and stopped using it altogether when he sold Lot 2 in 1990. There is no evidence that he used the Lot 1 easement over Lots 5 and 2 to access Lot 1 on behalf of the Trust at any time. He certainly did not do what he did with the Lot 2 easement: drive on it, even though it was undeveloped, with a witness, at least twice a year. The fact that he did this for the Lot 2 easement, and then stopped doing it once he sold Lot 2, shows how carefully he stewarded the easement on Lot 2. He did nothing of the kind with respect to the Lot 1 easement. Moreover, he informed his fellow Trustees of events and developments and activities on Lot 1. Nicholas Ward is the remaining Trustee, and he had no idea from any source at any time about the Lot 1 easement, even though CYFJr. kept him informed about the Lot 2 easement and other developments on the Trust property.

- There is no evidence that CYFJr. or anyone on behalf of the Ferris Trust sought to control or object to the growth of the pine trees on the uphill portion of the Lot 1 easement (even though CYFJr. had obviously taken offense at James Brock planting a spruce tree in the path of what he recognized as the Lot 2 easement) and those pine trees have now become a wide thick stand of mature trees that would be difficult to drive through (Compare Exhibit 24-A with Exhibit 24-H).

- Nicholas Ward as Trustee of the Ferris Family Trust and thus an owner of Lot 1 from 1978 until 2011 had no knowledge at any time of the Lot 1 easement for the benefit of Lot 1.

- Dale Phillips, daughter of CYFJr., obtained a survey in 2016 for a totally different purpose and was surprised to learn of the existence of the Lot 1 easement, which she did not know about before.

- Since 1979 and perhaps before, no one took any steps to develop or even discussed in any way the protection of any portion of the Lot 1 easement (as distinct from the shorter Lot 2 easement) beyond the end of the Town road, nor has anyone made any written or oral statements of claim to do so. The entire area of the Lot 1 easement remained undeveloped as a right of way. The only activity on it has been the actions of the Fosses and Brocks to use the portion near the Lot 5 house in conjunction with their use of their Lot 5 residence. Otherwise, the full length of it has been left in its natural state by owners Bush (Lot 2), Foss (Lot 5), and both generations of Brocks (Lots 5 and 2).

5

- James Brock and Richard Brock were both lawyers who did land transaction work and their office represented the Ferrises and prepared the Ferris Family Trust document. Richard Brock witnessed the signatures on the Trust instrument at the time of creation. Richard Brock was very aware of the difficulty between CYFJr. and James Brock (his father and fellow lawyer) over the "right of way problem" affecting Lot 5 and the negotiations and steps taken to resolve that issue. At no time was Richard Brock ever aware of the existence of any easement or claim of an easement across Lots 5 and 2 for the benefit of Lot 1.

- James Brock's concern about the existence of an easement crossing in front of his house on Lot 5 was so significant that interactions over the resolution of the Lot 2 easement led to a complete falling out with his close friend of 20 years.[2] If he had known about the existence of a Lot 1 easement, as both an owner of Lot 5 and a lawyer he would have addressed it.

- Similarly, if CYFJr. had known about the existence of a Lot 1 easement, as an owner (the actively functioning Trustee of the Trust), and a person who kept meticulous track of legal interests, he would have addressed it.

After the Brocks (James and Gladys Brock, hereinafter JGBrocks) purchased Lot 5 in 1988, the sugar maple tree and Norway maple trees planted in the path of the Lot 1 easement by the Fosses continued to grow. After the JGBrocks purchased Lot 2 in 1990, they treated the entire easement area located on their lots as theirs, believing that the Lot 2 easement was extinguished by merger and that the land was free from any easement interest.

In 1992, not long after the purchase of Lot 2, the JGBrocks erected a wooden fence on the boundary line between the Trust and their Lot 5. The fence began at the cul-de-sac at the end of the Town road and ran 170 feet along the boundary line, thereby cutting off the Trust's access to its Lot 1 along the first 170 feet of the Lot 1 easement. The fence was substantial and painted white. It was visible from the Ferris house. It has never been challenged or removed and has been continuously maintained by the owners of Lot 5.

The effect of the fence was not only to limit access to Lot 1 from the Lot 1 easement for the distance of 170 feet, but it also created a space that demarcated a yard area related to the Brock house. Just as placement of a sofa or table in a large room can create and mark an identifiable area for a particular purpose as a subarea within the room, the placement of this substantial wooden fence, painted white, has the visual effect of creating a curtilage area for the house: looking from the cul-de-sac, to the right is the house (which faces left), to the left is the fence, and in the middle is the sugar maple tree.

---

[2] There was some evidence to suggest that the men's relationship had started to weaken prior to the Lot 2 right of way issue. Even if that is so, which is not well established, the evidence is clear that the Lot 2 right of way issue and the manner in which it was resolved put a nail in the coffin of any relationship.

6

It now has the look of a classic Vermont property: a white house with a stately maple tree in the front yard, and a fence that separates its property from that of the neighbors.

In addition to the fence marking a curtilage area, it is reasonably inferred from the evidence that the erection of the fence was also a statement of claim of ownership. Shortly after resolving the right of way problem through what he thought was a forced purchase, James Brock put up a substantial white fence in a location clearly visible from the Ferris residence on the portion of the boundary between the properties that had been the source of dispute. It was not an enclosure fence, nor a fence that ran the full length of the boundary. Rather, it was erected for a distance that covered the area of previous dispute. It reasonably conveyed a message to the uphill neighbors, the Ferrises, including CYFJr., who could see it every day from the house, that stated, 'From this fence to my house is now my property. You now have no interest in it and you are to stay on your side of this fence.'

CYFJr. never said anything to Nicholas Ward about this fence. He also never said anything to Nicholas Ward about the existence of any Lot 1 easement benefiting Lot 1. Given CYFJr.'s meticulous attention to detail and to the interests of the Trust, it is reasonable that if he thought that the Trust held any legal interest on the Brock side of the fence, he would have communicated that to his fellow Trustee Nicholas Ward, the Trustee of the Trust for the next generation, and done something about it. Nicholas Ward saw the fence and assumed that it marked the boundary between the Trust and the JGBrocks. It was his understanding that the sale of Lot 2 to the JGBrocks had resolved the problem of any right of way existing on the JGBrocks' land.

On the Ferris Trust/Lot 1 side of the fence, just uphill from the fence, was a large stand of 400 Christmas trees that CYFJr. had planted when they were 6" seedlings with the help of family members. The purpose of the trees was to obtain a tax deduction. The trees grew fast and CYFJr. and various family members trimmed, managed, and harvested the Christmas trees over the years. The Brock fence was visible from the stand of Christmas trees where Ferris family members continued to cultivate the Christmas trees.

By 1996, Marguerite and CYFJr. were getting older and needed family attention and assistance. Plaintiff Dale Phillips is the daughter of CYFJr. She had never lived at the property as she was already an adult when the house was built. She had visited a few times a year up to that point. She began visiting a little more.

James and Gladys Brock were also aging and needing help. Their daughter Linda moved in with them in 1996 to help care for them.

That year, 1996, the JGBrocks erected 21 No Trespassing signs around the perimeter of their property (Lots 5 and 2), enclosing the easement area within the area marked by the signs that were approximately 200 feet apart. The signs were signed by James and Gladys Brock on their face. Dale Phillips testified that she did not see them, but she was not living at the property and only visiting occasionally. It is credible that

7

they were there (there are photos of the actual signposts with placards, which were later used by the family for another purpose) and openly visible to anyone who approached the Brocks' boundary. The signs read: "POSTED, PRIVATE PROPERTY, HUNTING, FISHING, TRAPPING OR TRESPASSING FOR ANY PURPOSE IS STRICTLY FORBIDDEN, VIOLATORS WILL BE PROSECUTED."

In December of 1996, CYFJr. died, leaving Marguerite, Nicholas Ward, and Tikhon Ferris as the remaining Trustees of the Ferris Family Trust, owner of Lot 1. Marguerite continued to live at the home on Lot 1. Her son Nicholas Ward helped her with needed improvements to the property (floors, roof, windows, a bathroom) and helped make arrangements for mowing and snowplowing. He had been visiting regularly since 1989 when he had acquired a second home in Vermont (he previously lived in Connecticut).

The following year, 1997, Marguerite began to decline and gradually needed closer attention. Nicholas Ward moved to Vermont in 2001 and installed his business office in what had previously been the office of his stepfather, CYFJr. This served the dual purpose of allowing him to be close to his mother, whose mind was gradually deteriorating, on a daily basis, as well as having a pleasant office in beautiful surroundings. This continued from 2001 until July of 2010 when Marguerite left the home to move to an Alzheimer's facility. During this period, he was the Trustee of the owner Trust with the greatest onsite physical presence and involvement with the property. Nicholas Ward left the use of his office on the Lot 1 property in 2011.

Throughout his entire familiarity with the property, in whatever capacity (Trustee/owner, son, stepson, office occupant), he never knew of the existence of the Lot 1 easement. Although from 1979 to 1990, during the period of CYFJr.'s ownership of Lot 2, he accompanied CYFJr. approximately twice a year in driving on the easement to Lot 2, they never went uphill into the pine trees and further to the open field, meaning that they never travelled the full course of the Lot 1 easement. Nicholas Ward did not know that there was an easement that continued up along the full western boundary line.

The maple and spruce trees on the Brock property in the easement area between the house and the fence continued to grow and increase in size, as can be seen by comparison of the 1996 and 2003 ortho aerial photos (Exhibits 24-G and 24-H). The pine trees in the upper back part of the Lot 1 easement area had been left by the Brocks to grow naturally, and they grew taller and thicker.

In 2000, James Brock died. Linda stayed with Gladys Brock until October of 2002, when she left Vermont to care for family in Texas, and Richard Brock (son of James and Gladys) and Richard's wife Sarah (hereinafter RSBrocks) moved in with Gladys Brock 6 days per week and maintained an active presence in the parents' property thereafter. In 2004, they acquired full ownership of Lots 5 and 2 from the Estate of Gladys Brock and it became their primary residence.

8

The RSBrocks had a different perspective on the use of their land by others than the JGBrocks did. Rather than exclude everyone from the property through No Trespassing signs, they were willing to open the land for recreational uses such as walking and hiking and cross-country skiing, but they did not want motorized vehicles, camping, or fires on the land. They took down most of the No Trespassing signs. At the northern end of the white fence, facing the cul-de-sac, they erected a sign that read:

Welcome to Cutler's End

The 10 acre field and the 10 or so acres of woods downhill or west, of it, is Cutler's End. Cutler's End is open for recreational use, including hunting. Please - no

Motor vehicles
Fires
Litter
Unsupervised pets (pets in the company of their owners are
welcome)

Thank you
Sarah and Richard Brock 223 7029

The sign is clearly visible from the cul-de-sac and has been there since it was put up in 2004. They also put up similar signs at two other locations on their boundary. For anyone approaching the Lot 1 easement area from the cul-de-sac (the end of the Town road), this is a clearly expressed and marked exercise of control over the property ahead, which includes the full width of the 60-foot wide Lot 1 easement area between the Brock house and the white fence as well as on the land beyond.

The sign prohibits the use of motorized vehicles, which is in direct conflict with the purpose of the Lot 1 easement, which was created to provide access to Lot 1. Use of the access easement to Lot 1 would require the use of motorized vehicles not only for passage but for any construction or development on Lot 1.

After the RSBrocks began living in the house in 2002, they noticed that in the winter the Town deposited snow onto Lot 5 within the Lot 1 easement area as a result of snowplowing the Town road. Although they were unaware of the existence of any easement, they believed that the snow, which was piled up in large snowbanks, was on Brock land. After the RSBrocks took title, the Road Commissioner called and asked permission to continue to pile snow on their land, and they gave permission. There is no evidence that any member of the Ferris family or any Trustee of the Trust was ever asked by the Town for permission to deposit snow in the Lot 1 easement area. The snowbanks are high and block passage across the easement area.

At one point the Brocks had concern about the possibility of a neighbor driving an ATV across the land between the Brock house and the fence (the easement area, although unknown to the Brocks), and the RSBrocks were concerned that the potential driver

9

would not consider an ATV a prohibited "motorized vehicle." They put up a rope from the white fence to a post between the sugar maple tree and the house. The rope crossed and blocked a good portion of the Lot 1 easement area. They left it up for several months but took it down so that cross country skiers would not be blocked from skiing across the Brock side of the fence in the Lot 1 easement area.

In 2009, the RSBrocks held a wedding on their property. They hired a bulldozer to build a base for the wedding tent. The bulldozer, the tent, equipment, and vehicles were openly in the easement area for more than two days. The Brocks never sought permission from anyone, and no one objected.

In March of 2011, after Marguerite had moved away, Dale Phillips and her brother Tikhon purchased, through the trust, the full interest in the property. Nicholas Ward resigned as Trustee on amicable terms. Marguerite's side of the family had had the opportunity to purchase the CYFJr. family's interest in the Trust and been unable to do so, so the second generation of the CYFJr. family acquired full interest.

Neither Dale Phillips nor Tikhon Ferris took up residence. The Trust rented the property to a tenant who was there for 4 ½ years. He used and mowed trails in the area and observed the terms of use on the sign erected by the Brocks. He saw the white fence and assumed it marked the boundary between the Trust and Brock properties. He also interpreted the Brocks' sign to mean that they had control over the area described on the sign, which included the Lot 1 easement area.

By 2011, there were three sizeable trees growing in the easement area between the Brock house and the 170-foot fence and Trust boundary line. Although they would not necessarily prevent a vehicle from driving past them, they represented a continuing statement of use by the Brocks of the easement area in front of their house as yard or curtilage area in relation to their house, and they are structures that would need to be removed if there were to be any road-building on the easement.

The pine trees on the portion of the Lot 1 easement that curves to the east and runs uphill continued to grow and became a thick stand of mature trees. The ortho photos of 2013 and 2014 (Exhibits 24-H and 24-I) and the site visit demonstrate that this thick stand extends across the full 60-foot width of the easement area in the uphill portion, and that a vehicle could not drive through this stand. Considerable tree-cutting and work to restore the ground to its natural state would be needed prior to roadbuilding.

The RSBrocks often parked cars in the Lot 1 easement area. They did so regularly during the winter of 2015–2016 when they owned three cars. No one ever objected.

Tikhon died in September of 2011, and in 2012, Dale Phillips became the sole owner of the Lot 1 property in her individual capacity, free of the trust. She continued to rent it out and then in 2015 when she retired she moved in to the house as her own residence.

10

In 2016, she had questions about activity by neighbors on a different boundary and arranged for surveyor Stephen Fraser to do a survey. When she hired him, she did not mention anything about an easement along the western boundary. He uncovered the existence of the Lot 1 easement on Lots 5 and 2 through his deed research and showed it on his survey. Dale Phillips testified that she was aware of an easement but thought it belonged to the Town. This testimony was vague as to what she was referring to, and her testimony in general showed a general misunderstanding of legal rights and interests in property. (For example, she thought No Trespassing signs just meant no hunting.)

Her testimony did not credibly show that either before or after 2011 (when she became a Trustee) or at any time from 2012 to 2016, during which time she herself was owner, she had any idea that Lot 1 was benefited by an easement over Lots 5 and 2. The evidence is convincing that she learned of the easement for the first time in 2016 when Stephen Fraser notified her of it. When he did so, she demonstrated surprise. She recorded the survey and then went to the RSBrocks and asked them to remove the fence. They were unaware of the existence of an easement and said they would research it. This lawsuit ensued.

The sugar maple tree has grown considerably over the years. The maple tree now has a crown that is approximately 50-feet wide, nearly covering the entire width of the Lot 1 easement, as well as a comparably sized root structure beneath the ground. It is a notable feature of the curtilage area of the RSBrock residence. In addition to the sugar maple, the Norway maple and the non-native spruce tree are mature trees that have grown in the easement area near the Brock house. No one has ever complained about the growth of the trees in the Lot 1 easement area or requested that they be removed.

Dale Phillips testified credibly that over the years she occasionally crossed from the area of the Lot 1 easement on Lots 5 and 2 onto Lot 1: once in the late '90s when driving some tree debris uphill in a pickup truck with family members, and later walking 3–4 times between 2004 and 2015. There is no evidence that such uses were based on knowing utilization of an easement appurtenant to Lot 1. The walking uses are fully consistent with the use by unrelated others and with the Brocks' signage statement of permission to the public to walk in the area.

### Conclusions of Law

The legal theories at issue now are abandonment, acquiescence, and adverse possession: (1) whether the dominant estate holder (Plaintiff and her predecessors in interest) abandoned their right to the Lot 1 easement; (2) whether they acquiesced to the termination of the Lot 1 easement; or (3) whether use of the Lot 1 easement by the

11

servient estate holder (Defendants and their predecessors in interest) terminated the Lot 1 easement by adverse possession.[3]

For the reasons stated below, the court concludes that abandonment has not been proven, that the doctrine of acquiescence is not suited to the facts of this case, and that Defendants have proven that the Lot 1 easement terminated due to adverse possession.

Defendants' Defenses: Abandonment and Acquiescence

*Abandonment*

The Vermont Supreme Court has described the rule regarding the abandonment of an easement as follows: "The burden on the party claiming an abandonment of an easement is a heavy one: Such an abandonment may be established only by 'acts by the owner of the dominant tenement [Plaintiff in this case] conclusively and unequivocally manifesting either a present intent to relinquish the easement or a purpose inconsistent with its future existence.'" *Lague, Inc. v. Royea*, 152 Vt. 499, 503 (1989) (citation omitted). "The affirmative conduct required to demonstrate an intent to abandon must be that of the easement holder, not that of the owner of the servient estate." Jon W. Bruce and James W. Ely, Jr., The Law of Easements & Licenses in Land § 10:20. "[T]he difficulty of proving intent to abandon an easement is such that its application is often impractical." *Lague*, 152 Vt. 502.

Plaintiff and her predecessors in interest, from the time of the 1990 sale of Lot 2 and at all times until 2016, were unaware of the existence of the Lot 1 easement. Their conduct clearly reflected ignorance that it existed or passive acceptance that it no longer existed. Accordingly, the facts do not show unequivocal, affirmative conduct on their part to relinquish their rights to it. Abandonment therefore is not shown.

*Acquiescence*

To the extent that Defendants may have relied on acquiescence as a standalone defense earlier in this case, they appear to do so no longer—they do not mention it in their posttrial brief. Plaintiff argues that acquiescence sometimes is used to resolve the location of a boundary but typically is not used in cases with controversies over the termination of an easement.

Acquiescence, to the extent that it connotes passive acceptance, is not suited to this case. "An easement created by deed is not extinguished by mere nonuser, no matter

---

[3] "The term 'prescription' is usually applied to acquisition of easements or other non-fee interests. The term 'adverse possession' is usually applied to acquisition of fee interests. This distinction is not always clear, but it is settled that the rules of law applicable to the two are in harmony." *Russell v. Pare*, 132 Vt. 397, 401 (1974), overruled on other grounds by *Lague, Inc. v. Royea*, 152 Vt. 499 (1989). Because there is no fundamental difference between prescription and adverse possession in this case, and the parties exclusively use the expression adverse possession, the court does as well.

how long continued." *Nelson v. Bacon*, 113 Vt. 161, 172 (1943). "The law is well-settled that the owner of an easement created by express grant is under no duty to make use of the easement in order to retain his entitlement." *IB Prop. Holdings, LLC v. Rancho Del Mar Apartments Ltd. P'ship*, 263 P.3d 69, 76 (Ariz. Ct. App. 2011) (citation omitted). Passivity alone is akin to mere nonuse.

Thus, the doctrine of acquiescence is inapplicable to this case. To apply it would blur the lines separating abandonment, estoppel, and adverse possession and is neither necessary nor helpful. Any claim of acquiescence is therefore denied.

Defendants' Counterclaim: Adverse Possession

The Vermont Supreme Court has described the elements of adverse possession in the context of the extinguishment of an easement as follows:

> To extinguish an easement by adverse possession, [the servient estate owner] must show an ouster of the dominant owner of the easement by open, notorious, continuous, hostile and adverse possession . . . for the statutory period of fifteen years. "The possession must be unequivocal and incompatible with possession and use by the dominant owner." To start the prescription period, [the servient owner] must show that it acted "clearly wrongful as to the owner of the easement." Its use of the land must be incompatible or irreconcilable with use of the easement.

*Okemo Mountain, Inc. v. Town of Ludlow Zoning Bd. of Adjustment*, 164 Vt. 447, 452 (1995) (citations omitted); see also 12 V.S.A. § 501 (setting forth the 15-year period for the recovery of lands).

An adverse possession claim by the servient owner of an easement (which would extinguish the easement) that has gone unused by the dominant owner can create a special conflict. The servient owner, being the owner of the land burdened by the easement, generally is free to use the burdened property so long as the servient owner's use does not prevent the future use of the easement. Meanwhile, the dominant owner is not obligated to exercise the easement right to preserve the ability to use it in the future. Depending on the facts, a doctrinal problem may emerge: what conduct by the servient owner truly is adverse to a dominant owner who has no current need or desire to use the easement; i.e., what conduct is sufficient to trigger the beginning of the statutory period at the end of which the easement may be terminated?

In 1978, the Appellate Division of the New York Supreme Court distilled its review of relevant case law into a rule on which Plaintiff in this case relies heavily:

> The rule to be derived from these cases is that where an easement has been created but no occasion has arisen for its use, the owner of the servient tenement may fence his land and such use will not be deemed adverse to the existence of the easement until such time as (1) the need for the right

13

of way arises, (2) a demand is made by the owner of the dominant tenement that the easement be opened and (3) the owner of the servient tenement refuses to do so.

*Castle Associates v. Schwartz*, 407 N.Y.S.2d 717, 723 (N.Y. App. Div. 1978). The implication is that anything less would result in a windfall to the adverse possessor whose possession failed to give notice in fact that the dominant owner's rights were in jeopardy. The court arrived at this broadly stated rule in a case in which the easement existed only on paper and had never been located or used on the ground. *Id.* at 721.

The New York Court of Appeals, in a subsequent case, later affirmed the *Castle Associates* "exception" to ordinary adverse possession principles, but in doing so it carefully limited the applicability of the exception.

The theory underlying the exception is that easements not definitively located and developed through use are not yet in functional existence and therefore the owner of the easement could not be expected to have notice of the adverse claim until either the easement is opened or the owner demands that it be opened. It is only at such point, therefore, that the use of the easement by another is deemed to be adverse to the owner and the prescriptive period begins to run. So understood, the exception is consistent with the general theory of adverse possession— "that the real owner may, by unequivocal acts of the usurper, have notice of the hostile claim and be thereby called upon to assert his legal title."

*Spiegel v. Ferraro*, 541 N.E.2d 15, 17 (NY 1989) (citations omitted). As *Spiegel* explains it, the exception is less an exception to adverse possession principles and more a specialized application of them, reflecting a careful balancing of competing rights in difficult circumstances.

Jurisdictions addressing the notice problem presented in these situations have resolved it, often with a broader or narrower formulation of the *Castle Associates* rule and sometimes by rejecting it altogether. See the cases cited at Jon W. Bruce and James W. Ely, Jr., The Law of Easements & Licenses in Land § 10:25 nn. 35–38.

The essential character of adverse possession is "possession . . . *sufficient to put another on notice*, actual or imputable, of an adverse claim to the property." 4 Tiffany Real Prop. § 1132 (3d ed.) (emphasis added); see also *Matoush v. Lovingood*, 177 P.3d 1262, 1270 (Colo. 2008) ("[A] party claiming to have terminated an easement by adverse possession must prove 'that the use interferes significantly enough with the easement owner's enjoyment of the easement to give notice that the easement is under threat.'" (citation omitted)). With such notice, the dominant owner is obliged to defend her rights or risk losing them. The fundamental problem addressed by *Castle Associates* and related cases is one of notice that arises in niche cases where the overlap of the parties' rights may muddle the principles that, in other cases, would ensure clear notice.

14

The Vermont Supreme Court is plainly aware of the potential problem: it has observed that "it is difficult to establish adverse possession of an easement where the dominant owner abstains from using the easement." *Okemo Mountain, Inc. v. Town of Ludlow Zoning Bd. of Adjustment*, 164 Vt. 447, 453 (1995). Sufficient notice of adversity in such circumstances may require obstruction by a "permanent structure." *Id.* "Less permanent obstructions may be considered adverse *where the dominant owner recognizes the purpose is to prevent use of the easement.*" *Id.* (emphasis added).

The facts of this case present circumstances that are different from the notice problem as addressed in *Castle Associates* and related cases and mentioned in *Okemo*.[4] In this case, there was a controversy over use of the easement area on the Brocks' land. While the parties at the time articulated the controversy as the existence of the Lot 2 easement (not described that way at the time), the 'right of way problem' they were addressing was clearly about whether Plaintiff's predecessor would hold any future easement that burdened the Brocks' property. The controversy was not related to the legal descriptions or origins of the Lot 1 easement or any distinction between the Lot 1 and Lot 2 easements. The controversy was over *any* use of right by third parties of the easement area on the Brocks' land.

The parties resolved that actual controversy to their satisfaction when the Brocks acquired Lot 2. Doing so did not legally terminate the Lot 1 easement at that time. However, all parties concerned believed that the transaction finally resolved the easement dispute and that the easement area thereafter was unburdened by any easements. Everyone acted accordingly afterwards. From that point in 1990 until the 2016 survey, every action taken by Defendants and their predecessors asserting their possession of the easement area could only have been reasonably interpreted as expressing their claim to *exclusive* possession of the easement area. CYFJr. and Nicholas Ward, as Trustees, had full notice of the resolution of the controversy, and the Brocks' subsequent actions, including the immediate erection of the fence.

Thus, while the 1990 conveyance did not terminate the Lot 1 easement, its circumstances fundamentally inform the character of every material action taken by Defendants and their predecessors in interest in the easement area thereafter. They also explain nonuse and passivity by Plaintiff and her predecessors, which was in stark contrast to CYFJr.'s protection of property interests, and how they reasonably would have interpreted Defendants' conduct: It was not *mere* nonuse; the conduct of Defendants' predecessors was that of an owner exercising exclusive incidents of ownership and possession.

After the purchase of Lot 2, Defendants' predecessors in interest installed a white fence, the only purpose of which was to serve as an obvious, visual reminder to Plaintiffs' predecessors in interest that they no longer had any right to the easement area. They also posted No Trespassing signs that, in the circumstances, Plaintiffs' predecessors in interest could only have reasonably interpreted to apply to them as well as all others.

---

[4] Bruce and Ely note that "[r]esolution of the adversity issue is heavily fact dependent." Jon W. Bruce and James W. Ely, Jr., The Law of Easements & Licenses in Land § 10:25.

15

When the No Trespassing signs came down, the "Welcome to Cutler's End" sign went up, which specifically prohibited motorized vehicles. Defendants also permitted trees to grow to massive sizes in multiple locations, permitted snow to be placed in the easement area in a manner that blocked access, roped access off for a time, and bulldozed in the easement area to use it in a manner that, for a time, could not have permitted consistent use by the easement holder.

All these actions, in context of the history and circumstances of this case, clearly, coherently, and continuously announced to the dominant owners that the servient owners were claiming the easement area *with exclusivity* and that the dominant owners needed to defend their rights or risk losing them. Plaintiff and her predecessors in interest did nothing in response for far longer than the statutory period and thus lost their Lot 1 easement right. The fact that their nonuse may have been due to a mistaken belief that they already had lost any rights to the easement area is immaterial. Their mistake does not negate their obligation to respond to a challenge to their ownership. Defendants' predecessors, in 1990 and from then on, unfurled their flag in the easement area, providing clear notice of their claim of exclusive ownership. Plaintiff's predecessors had clear notice which called for them to assert and defend their claim to the Lot 1 easement, and they failed to do so. Defendants' adverse possession claim to exclusive possession of the land subject to the Lot 1 easement began in 1990 and ripened in 2005. In the circumstances, any conclusion to the contrary would be inequitable and would allow a dominant owner's qualified right to nonuse to completely swallow the doctrine of adverse possession. That is not the law of Vermont.

## ORDER

For the foregoing reasons, Defendants are entitled to judgment in their favor on their claim of adverse possession of the Lot 1 easement. Defendants' attorney shall prepare a form of Judgment for review by Plaintiff's attorney.

Dated at Montpelier, Vermont this 4th day of October 2019.

Mary Miles Teachout
Superior Judge

16